UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| 1031 CANAL DEVELOPMENT, LLC | CIVIL ACTION |
| VERSUS | NO: 24-2457 |
| NATIONAL FIRE & MARINE INSURANCE COMPANY AND EVEREST INDEMNITY INSURANCE COMPANY | SECTION: "J"(2) |

## ORDER AND REASONS

Before the Court are a *Motion to Dismiss* **(Rec. Doc. 17)**, filed by Defendants Everest Indemnity Insurance Company and National Fire & Marine Insurance Company, and an opposition filed by Plaintiff 1031 Canal Development, LLC (Rec. Doc. 18) to which Defendants have replied (Rec. Doc. 20). Additionally, Plaintiff has filed a sur-reply (Rec. Doc. 24), to which Defendants have replied (Rec. Doc. 27). Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds that the motion should be **DENIED**.

## FACTS AND PROCEDURAL BACKGROUND

This case arises out of the partial collapse of the Hard Rock Hotel on October 12, 2019. In earlier-filed litigation, the contractor for the project, Citadel Builders, L.L.C., raised an action of breach of insurance contract against Defendants Everest Indemnity Insurance Company and National Fire & Marine Insurance Company. *See Citadel Builders, L.L.C. v. National Fire & Marine Insurance Company et al.*, No. 23-

1

34 (E.D. La.) ("Citadel litigation"). The matter is still pending in this Court. Here, the owner of the project, Plaintiff 1031 Canal Development, LLC, brings its own breach of insurance contract action against Defendants. Due to its relation to the contractor's action, this case was transferred to this section of the Eastern District of Louisiana Court. Thus, the underlying facts and legal issues are familiar.

Everest and National Fire each extended insurance policies to 1031 Canal for the project. Although National Fire was the lead insurer—covering the first 72.8% of loss—both policies insured the risk of building loss or damage. The Everest Policy, in particular, envisioned a relationship with that provided by National Fire: "The provisions contained in this Policy shall supersede those of the Lead Policy wherever the same may conflict. The coverage provided by this Policy will be no broader than the coverage provided by the Lead Policy." *See* Rec. Doc. 17-5 at 2 ("Substitution of Terms"). And differences between the policies exist: the National Fire policy provides a two-year limit for the filing of a breach of contract suit, whereas the Everest policy balloons the deadline to five years. Plaintiff's action was filed October 11, 2024—just under five years from the project's 2019 partial collapse.

Also possibly impacting the timeliness of this action, Defendants tendered multiple payments to Plaintiff "near policy limits for the loss": (1) October 17, 2019; (2) December 11, 2019; (3) February 11, 2020; (4) October 7, 2020; (5) December 27, 2021; (6) March 11, 2022; (7) August 25, 2022; and (8) September 7, 2022. (Rec. Doc. 1 at 8 ¶¶ 39–40). The final four payments occurred more than two years after the incident. Unlike contractor Citadel's earlier-filed action, however, Plaintiff's suit was

filed more than two years after the final payment.

As in the earlier-filed Citadel litigation, Defendants move for dismissal on prescription grounds. Plaintiff opposes.

## **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[D]etailed factual allegations" are not required, but the pleading must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. The court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). However, "'conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.'" *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (citation omitted).

## **DISCUSSION**

Defendants predominantly repeat arguments made before this Court in the Citadel litigation. With the same undersigned counsel, Defendants again move for dismissal on prescription grounds. The territory is well trod. With the same loss event

and insurance policies, Plaintiff argues the prescription issue is subject to the doctrine of collateral estoppel.

### A. Collateral Estoppel

Collateral estoppel, also known as "issue preclusion," precludes litigating an issue if the identical question has been litigated in a prior suit which could not have been decided without its resolution. *See Bradberry v. Jefferson Cnty.*, 732 F.3d 540, 548–49 (5th Cir. 2013). Offensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 356 (1979).

To apply collateral estoppel offensively, the plaintiff must show that four conditions are met: "(1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine." *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1421–22 (5th Cir. 1995) (citation omitted). The Supreme Court has set out three illustrative circumstances that would make issue preclusion unfair: (1) the plaintiff easily could have joined the previous action but chose not to; (2) the defendant had little incentive to defend vigorously; and (3) the judgment upon which the plaintiff seeks to rely is itself inconsistent with a previous judgment in favor of the defendant. *Parklane Hosiery Co.*, 439 U.S. at 330–31. Courts have broad discretion to determine whether the offensive collateral estoppel bar

should apply. *Id.* at 331.

Here, parties debate the propriety of issue preclusion, focusing on the finality of the Court's denial of dismissal on prescription grounds in the Citadel litigation. Emphasizing different quotations from Fifth Circuit caselaw, both marshal apparent support for their respective positions. For Defendants, "[i]mplicit in the third element of collateral estoppel is the requirement for a final judgment." (Rec. Doc. 20 at 2 n.6 (quoting *Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 228 (5th Cir. 2018))). In contrast, Plaintiff insists "judgments are final for purposes of issue preclusion when fully litigated, even if not yet appealable." (Rec. Doc. 24 at 2 (quoting *Cycles, Ltd. v. Navistar Fin. Corp.*, 37 F.3d 1088, 1090 (5th Cir. 1994))).

In the collateral estoppel context, the finality requirement is a flexible standard. *See Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1191 (5th Cir. 1982), *vacated and remanded on other grounds*, 460 U.S. 1007 (1983), *reinstated on this ground*, 718 F.2d 725, 728 (5th Cir. 1983) ("[T]he finality requirement does not necessarily demand the ministerial act of executing a judgment."). Eschewing a bright-line rule, courts assess the fairness of the application based on the circumstances. *Id.* at 1189 (quoting *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1171 (5th Cir. 1981); *see also* 18A Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 4434 (3d ed.) ("[I]f issue preclusion rests on determinations made before completion of all trial proceedings in the first action, it is important to recognize that some modification must be made in the rules that limit preclusion to issues necessary to the first judgment."); Restatement (Second) of Judgments § 13

(1982) (weighing whether delay until final judgment presents "hardship"). Here, although the Court considered multiple motions on the prescription issue, the Citadel litigation itself is far from a conclusion. The propriety of issue preclusion in this case, however, is more easily resolved than on the question of judgment finality.

    1031 Canal is a classic "wait-and-see" plaintiff and, therefore, cannot benefit from issue preclusion. The *Parklane* court previewed the very situation encountered here:

> Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. Thus offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action.

*Parklane Hosiery Co.*, 439 U.S. at 330 (citation omitted). As a threshold issue in the Citadel litigation, this Court had to determine the contractor's rights to an insurance contract between the instant Plaintiff and Defendants. The complexity of that issue would have been reduced by Plaintiff's presence in the earlier-filed action. Now, after its contractor received a positive ruling on prescription, Plaintiff files its own action, doubling the litigation. Parties fail to brief the issue, but this Court observes no "valid reason for not joining [the] earlier action." *Hauser v. Krupp Steel Producers, Inc.*, 761 F.2d 204, 207 (5th Cir. 1985); *see also Hicks*, 662 F.2d at 1172 (cautioning against new plaintiffs "riding [another's] coat tails to a judgment"). This Court refuses to apply collateral estoppel to the prescription issue in this litigation.

## B. The Florida Amendatory Endorsement Applies to the Everest Policy

Although the Citadel litigation provides no preclusive effect, various issues require similar treatment. For one, Defendants again argue the Florida Amendatory Endorsement—and its five-year period for litigation filing—does not apply to either insurance policy, despite its attachment to the Everest Policy.

The Everest Policy itself is a two-page insurance declaration, followed by two builders risk endorsements and a terrorism exclusion endorsement. As previously noted, within the signed declaration itself, the parties agreed that the Everest Policy language would "supersede those of the Lead Policy wherever the same may conflict." Rec. Doc. 17-5 at 2. In the policy's next section, parties likewise agreed on how to treat the "Titles of Provisions and Endorsements":

> The several titles of the various provisions of this Policy as now or hereafter attached to this Policy, are inserted solely for convenience of reference and shall not be deemed in any way to limit or affect the provisions to which they relate.

*Id.*

Undisputedly, Louisiana substantive law applies to this dispute over an insurance contract delivered within the state. *See Adams v. Unione Mediterranea Di Sicurta,* 220 F.3d 659, 677–78 (5th Cir. 2000). Under Louisiana law, insurance policies are contracts between the insurer and insured, and are interpreted under contract law as provided by the Louisiana Civil Code. *Smith v. Matthews,* 611 So. 2d 1377, 1379 (La. 1993). And, if the language in the policy is clear and unambiguous, the policy should be enforced as written. *Supreme Services and Specialty Co., Inc. v.*

*Sonny Greer, Inc.,* 958 So. 2d 634, 638 (La. 2007). The question of whether an insurance contract provision is clear, unambiguous, and enforceable is a question of law for the court to decide. *First Nat'l Bank of Jackson v. Pursue Energy Corp.*, 799 F.2d 149, 151 (5th Cir.1986).

Here, the Everest Policy's "heading" provision is unambiguous. By the very language of the Everest declaration, entitling both builders risk endorsements as "Florida Amendatory Endorsement" does not thereby void seven pages of parties' agreed-upon terms. And within that endorsement, parties agreed to a suit deadline longer than the minimum protections in Louisiana law:

> No legal action or proceeding may be brought against the Company for the recovery of any claim under this Policy unless commenced within five (5) years from the discovery by the Insured of the loss or damage which gives rise to the claim.

Rec. Doc. 17-5 at 9 (emphasis omitted). This action was filed less than five years from the project's partial collapse. Accordingly, based on those terms, Defendants' prescription argument as to the Everest policy is unavailing.

Further, a full reading of the Everest Policy's "Substitution of Terms" section permits the prescription extension. As previously noted, the Everest Policy trumps the provisions of the National Fire Policy: "The provisions contained in this Policy shall supersede those of the Lead Policy wherever the same may conflict." *Id.* at 2. The section continues, however: "The coverage provided by this Policy will be no broader than the coverage provided by the Lead Policy." *Id.*

This Court finds the Everest Policy does not prohibitively broaden coverage.

On this issue, parties' limitation intent is ambiguous. On one hand, "coverage" is normally understood as an "inclusion of a risk under an insurance policy; the risks within the scope of an insurance policy." BLACK'S LAW DICTIONARY (12th ed. 2024). From that perspective, a suit-filing extension would not thereby create broader coverage, but merely increase the time to seek coverage enforcement. On the other hand, however, this agreement was delivered in Louisiana, a state uniquely concerned over the vestment of rights through the running of liberative prescription. *See Bienvenu v. Defendant 1*, 2023-01194 (La. 6/12/24), 386 So. 3d 280, 285 (citation omitted, quotation cleaned up) ("A right is vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest . . . . Consistent with this definition, the court has determined that when a party acquires a right to defend against a cause of action, that right becomes a vested property right."). Under this, admittedly more strained, reading, parties to this Louisiana insurance contract would not wish for a broadening of Plaintiff's right to bring suit through the retreating of Defendants' vesting of rights through prescription. With two possible readings of the provision, the language is ambiguous.

    If after applying the general rules of contract, a policy ambiguity remains, the ambiguous contractual provision is construed against the insurer and in favor of coverage as per the rule of strict construction. *Cadwallader v. Allstate Ins. Co.*, 2002-1637 (La. 6/27/03), 848 So. 2d 577, 580 (citations omitted). This strict construction rule applies only if the ambiguous policy provision is susceptible to two or more

reasonable interpretations, which is not the case here. *Id.* Here, even if the insurer-favorable reading of the Everest Policy provision is reasonable—and, *arguendo*, it is—Plaintiff still would receive the benefit of the longer, five-year period to file its action against Everest.

### C. The Florida Amendatory Endorsement Does Not Apply to the National Fire Policy

Plaintiff, however, cannot benefit from the Florida Amendatory Endorsement's five-year prescription in its action against National Fire. As previously discussed, Plaintiff was covered on contracts issued by National Fire and Everest. National Fire provided the lead policy, covering 72.184% of the total insured value and policy limit. (Rec. Doc. 17-4 at 57). The Everest Policy covered the remaining 27.8%. (Rec. Doc. 17-5 at 1). Most pertinently, instead of the Everest Policy's five years to commence legal action, the National Fire Policy contained a two-year deadline.

The Everest Policy acknowledged that it was "[a]ttached to and forming part of Policy No. 42-PBR-304657-01", namely, the National Fire Policy. (Rec. Doc. 17-5 at 1; *see also* Rec. Doc. 17-4 at 3). As previously noted, the Everest Policy specified the construction of its terms: "The provisions contained in this Policy shall supersede those of the Lead Policy wherever the same may conflict. The coverage provided by this Policy will be no broader than the coverage provided by the Lead Policy." (Rec. Doc. 17-5 at 2). Although the Everest Policy references the lead policy, the National Fire Policy is silent as to the Everest Policy, in no way indicating an adoption of the terms of a supplemental policy.

Thus, the Everest Policy anticipates and adopts provisions of the National Fire Policy, but not vice versa. Pertinent here, the Everest Policy's five-year deadline applies to actions against it, but this term does not flow up to actions against National Fire. The National Fire Policy terms are clear and unambiguous that legal action against National Fire must be "brought within two (2) years after the subject loss or damage[.]" (Rec. Doc. 17-4 at 30).

Again, if the language in a Louisiana insurance policy is clear and unambiguous, the policy should be enforced as written. *Supreme Services and Specialty Co.*, 958 So. 2d at 638. Plaintiff filed its action almost five years after the partial collapse of the Hard Rock Hotel. Thus, the action was timely under the terms of the Everest Policy, but has facially prescribed as to the National Fire Policy.

### D. Waiver Makes Action Under the National Fire Policy Timely

Where a claim has facially prescribed, "the burden shifts to the plaintiff to prove a suspension or interruption of the prescriptive period". *In re Taxotere (Docetaxel) Prod. Liab. Litig.*, 995 F.3d 384, 389 (5th Cir. 2021) (quoting *Younger v. Marshall Indus. Inc.*, 618 So. 2d 866, 869 (La. 1993)). Plaintiff argues claim actions taken and payments made beyond October 12, 2021—two years from the incident—waived National Fire's prescriptive period. Specifically, Plaintiff claims, without dispute, that Defendants made four payments in excess of $7 million after the two-year period elapsed. The last payment was tendered on September 7, 2022, nearly three years after the incident.

With litigation filed later than the time period established in an insurance

contract, Louisiana courts look for an insurer's waiver of the limitation period. "An insurer waives a limitation period if its overall actions lead the insured to reasonably believe the insurer will not require compliance with the policy provision that suit must be filed within the limitation period." *NAZ, L.L.C. v. United Nat'l Ins. Co.*, 779 F. App'x 200, 203 (5th Cir. 2019) (quotation cleaned up, citation omitted) (applying Louisiana law).

The Fifth Circuit has described waiver analysis as "fact-intensive", *id.*, indicating the evaluation may go beyond the confines of a motion to dismiss. Where documents to support a party's position go outside the pleadings, the court must convert the motion to dismiss into one for summary judgment. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014). Here, Plaintiff relies on its pleadings, but Defendants attach to their motion a series of letters between parties. (Rec. Doc. 17-6). The letters are not referenced in the pleadings. "When a party bases a motion to dismiss on matters outside the pleadings, the court has discretion either to accept the extraneous material and convert the motion to dismiss into a motion for summary judgment, or to decide the motion, as defendant styled it, under the principles of Rule 12(b)(6)." *McDonald v. Kansas City S. Ry. Co.*, 16-15975, 2017 WL 1709353, at *2 (E.D. La. May 3, 2017) (citations omitted). Accordingly, the Court converts the underlying motion to dismiss into a motion for summary judgment.

In the insurance context, the Fifth Circuit has indicated normal claim processing does not evidence waiver:

> [T]here was no admission or recognition of liability, no assurance of payment, no late request for additional information or for time to investigate the claim further, no intentional delay of adjustment beyond the limitation period, and no prolonged or continuous negotiations, lasting through most of the limitation period, which might tend to hold out a reasonable hope of amicable adjustment.

*NAZ, L.L.C.*, 779 F. App'x at 203 (quoting *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1288 (5th Cir. 1990)).

National Fire asserts that, at most, their four payments beyond the two-year litigation deadline could interrupt prescription, not waive the defense. And, as Plaintiff's action was filed more than two years after the final insurance payment, the claim has prescribed. Under this application, contractor Citadel would maintain its right of action in the earlier-filed litigation, but owner 1031 Canal would be barred from pursuing relief.

As support for its non-waiver argument, National Fire provides nine letters sent to Plaintiff, each containing an express reservation of rights statement. It highlights one letter to Plaintiff in particular. On February 19, 2020, counsel for National Fire quoted the Legal Action provision, with its two-year timeframe, to Plaintiff. (Rec. Doc. 17-6 at 22). To National Fire, the implication is clear: each letter reserved its policy rights, with the February 19, 2020 letter removing any doubt as to its defense of prescription.

National Fire's reading is overly simplistic, however. Its one specific reference to the two-year deadline for legal action had little to do with the commencement of legal action. Instead, the provision was quoted to support an argument for Plaintiff's

13

requirements to receive Replacement Cost Value ("RCV"):

> Builders Risk Underwriters further understand the Insured has inquired whether it has to rebuild the building to the same stage it was in at the time of the collapse within two years, or merely has to begin replacement with two years to qualify for the replacement cost value (RCV). Builders Risk Underwriters note the following policy terms relevant to this issue.
>
> . . . .
>
> 18. LEGAL ACTION AGAINST THE COMPANY
>
> . . . .
>
> Under the plain meaning of the words of the Policy, the work to repair or replace the Insured Project to its condition at the time of the loss must be completed, not merely begun, within the two years for RCV to apply.

(Rec. Doc. 17-6 at 23). Further, in its final attached letter, dated August 7, 2023, National Fire states that "our payments represent what we have thus far concluded is owed for this loss" and that "this investigation is ongoing[.]" *Id.* at 37.

This complex insurance loss presents the rare waiver described in *NAZ*. Further, in this summary judgment position, all reasonable inferences are drawn in favor of the nonmoving party, Plaintiff 1031 Canal. *See Little*, 37 F.3d at 1075. Negotiations were ongoing, investigation incomplete, and payments were made—four times, in excess of $7 million—beyond the two-year deadline for legal action. National Fire's actions beyond the prescriptive period would "lead[] the insured [1031 Canal] to reasonably believe the time limitation has been waived while the claim is under consideration". *NAZ, L.L.C.*, 779 F. App'x at 203 (5th Cir. 2019) (quoting *Maurice v. Prudential Ins. Co.*, 2002-0993 (La. App. 4 Cir. 10/23/02), 831 So. 2d 381, 385). Thus,

14

Plaintiff's claim under the National Fire Policy cannot be dismissed as prescribed.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Everest Indemnity Insurance Company and National Fire & Marine Insurance Company's *Motion to Dismiss* **(Rec. Doc. 17)** is **DENIED**.

New Orleans, Louisiana, this 24th day of March, 2025.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE